Francis J. "Casey" Flynn, Jr., #304712
**LAW OFFICE OF FRANCIS J. FLYNN, JR.**
6057 Metropolitan Plz
Los Angeles, CA 90036
Tele: 314-662-2836
Email: casey@lawofficeflynn.com

**ATTORNEYS FOR PLAINTIFFS**

*[Additional Counsel Listed Below]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH KELLY, derivatively on behalf of SNAP INC., <br><br> Plaintiff, <br><br> v. <br><br> EVAN SPIEGEL, DEREK ANDERSEN, ROBERT MURPHY, MICHAEL LYNTON, KELLY COFFEY, JOANNA COLES, LIZ JENKINS, JIM LANZONE, SCOTT D. MILLER, PATRICK SPENCE, POPPY THORPE, and FIDEL VARGAS, <br><br> Defendants, <br><br> -and- <br><br> SNAP INC., a Delaware Corporation, <br><br> Nominal Defendant. | Case No. 2:25-cv-8654 <br><br> **JURY TRIAL DEMANDED** <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR DAMAGES FOR:** <br><br> **(1) Breach of Fiduciary Duty (Derivatively Against the Director Defendants)** <br> **(2) Breach of Fiduciary Duty (Derivatively Against the Officer Defendants)** <br> **(3) Gross Mismanagement (Derivatively against All Defendants)** <br> **(4) Waste of Corporate Assets (Derivatively Against All Defendants)** <br> **(5) Unjust Enrichment (Derivatively Against the Officer Defendants)** <br> **(6) Violations of Section 10(b) and Rule 10b-5 of the Exchange Act (Derivatively Against All** |

113936v1

|  | Defendants)<br>**(7)   Violations of Section 20(a) of the Exchange Act (Derivatively against All Defendants)**<br>**(8)   For Contribution Under Sections 10(b) and 21D of the Exchange Act (Derivatively Against Defendants Spiegel and Anderson)** |
|---|---|

Plaintiff Joseph Kelly ("Plaintiff"), derivatively on behalf of Snap Inc. ("Snap" or the "Company"), brings the following complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violation of federal securities laws. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *Abdul-Hameed v. Snap Inc. et al.*, Case No. 2:25-cv-07844 (C.D. Cal.) (the "Securities Action"); (iii) corporate governance documents available on the Company's website; (iv) media reports; and (v) other publicly available information.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b), 20(a), and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), 78t-1, 78u-4(f), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

2.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

3.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

4.     Venue is proper in this court under 28 U.S.C. § 1391, because Snap's principal place of business is in this District, and a significant amount of the conduct at issue took place and had an effect in this District.

## NATURE OF THE ACTION

5.     This is a stockholder derivative action brought by Plaintiff, a stockholder of Snap, on behalf of the Company against the Defendants.  This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least April 29, 2025 to August 5, 2025 (the "Relevant Time Period"). During that time the Defendants (as defined herein) caused or allowed Snap to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.

6.     Snap is a technology company whose main product is the ubiquitous social media application Snapchat. Snapchat has approximately 400 million daily users and 900 million monthly users. Snap's business model is based on advertising revenue received by companies for ads published on Snapchat.

7.     Throughout the Relevant Time Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies. Specifically, from at least April 29, 2025 through August 5, 2025, Snap and its executive officers made materially false and misleading statements and failed to disclose that: (i) Snap's advertising growth potential was overstated; (ii) Snap's advertising revenue growth rate had significantly declined in

April 2025 to a 1% growth rate compared to a 9% growth rate in the first quarter of 2025 due, in part, to an execution error by Snap; (iii) Snap's advertising growth rate was vulnerable to ongoing headwinds in the industry, which were understated by Snap; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

8.     Then, after the market closed on August 5, 2025, Snap issued a press release announcing its financial results for the second quarter of 2025. Among other items, Snap reported an increase in net loss, and a decline in adjusted EBITDA. Snap also revealed that there was a decline in its advertising revenue growth rate, which Snap blamed on "an issue related to our ad platform, the timing of Ramadan and the effects of the de minimus changes."

9.     On this news, Snap's stock price fell $1.61 per share, or 17.1%, to close at $7.78 per share on August 6, 2025.

10.    Through this action, Plaintiff seeks to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements, as well as the inadequate internal controls that allowed the misconduct to occur, in breach of their fiduciary duties to the Company.

## PARTIES

### Plaintiff

11.    Plaintiff Joseph Kelly is a current shareholder of Snap and has continuously held Snap stock during all times relevant hereto and is committed to retaining Snap shares through the pendency of this action to preserve his/her standing.  Plaintiff will adequately and fairly represent the interests of Snap and its shareholders in enforcing its rights.

### A.    Nominal Defendant

12.    Nominal Defendant Snap is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are

located at 3000 31ˢᵗ Street, Santa Monica, California 90405. Snap common stock trades on the NYSE under the ticker symbol "SNAP".

**B.     Individual Defendants**

13.     Defendant Evan Spiegel, a co-founder of Snap, has been CEO and a director of the Company since 2012.

14.     Defendant Robert Murphy, a co-founder of Snap, has been Chief Technology Officer and a director of the Company since 2012.

15.     Defendant Michael Lynton has been a director of the Company since 2013.

16.     Defendant Kelly Coffey has been a director of the Company since 2020.

17.     Defendant Joanna Coles has been a director of the Company since 2015.

18.     Defendant Liz Jenkins has been a director of the Company since 2020.

19.     Defendant Jim Lanzone has been a director of the Company since 2024.

20.     Defendant Scott D. Miller has been a director of the Company since 2016.

21.     Defendant Patrick Spence has been a director of the Company since 2023.

22.     Defendant Poppy Thorpe has been a director of the Company since 2018.

23.     Defendant Fidel Vargas has been a director of the Company since 2021.

24.     Defendants Spiegel, Murphy, Lynton, Coffey, Coles, Jenkins, Lanzone, Miller, Spence, Thorpe, and Vargas are herein referred to as "Director Defendants."

25.     Defendant Derek Andersen has been CFO of the Company since May 2019.

26.     Defendants Spiegel and Andersen are herein referred to as "Officer Defendants."

## **FURTHER SUBSTANTIVE ALLEGATIONS**

A.    **Company Background**

27.     Snap is a technology company whose main product is the popular social media application Snapchat, which allows users to share photographs with other users. A user's photographs can be manipulated in a variety of ways, depending on the user's preference.

28.     Snap's business model is to sell advertisements that companies pay Snap to appear in a variety of forms on Snapchat, thus connecting advertisers to Snapchat users.

B.    **Snap's False and Misleading Statements**

29.     On April 29, 2025, Defendants issued a press release titled "Snap Inc. Announces First Quarter 2025 Financial Results", which summarized Snap's Form 10-Q for the first quarter of 2025. During the corresponding earnings conference call, Defendant Spiegel spoke highly of Snap's advertising revenue growth, stating, in part:

> In Q1, our community grew to 460 million daily active users, an increase of 38 million year-over-year, and content viewers and total time spent watching content grew year-over-year. Q1 revenue increased 14% year-over-year to $1.36 billion, driven by the progress we have made with our direct response advertising solutions, continued momentum in driving performance for small and medium-sized businesses, and the growth of our Snapchat+ subscription business. The benefits of our more focused investments are now evident in our improved profitability and free cash flow generation.

> *        *        *

> **Given the progress we have made with our advertising platform and the pace of execution against our 2025 strategic priorities, we**

**believe we are well-positioned to deliver improved business performance and meaningful positive free cash flow as we make further progress towards GAAP profitability.** We continue to make progress growing our global community, reaching 460 million DAU in Q1, an increase of 7 million quarter-over-quarter and 38 million or 9% year-over-year.

(Emphasis added).

30.    Defendant Andersen then weighed in on Snap's financial results and the Company's expectations for its advertising platform, stating, in part:

In Q1, total revenue was $1.363 billion, up 14% year-over-year and up 15% year-over-year on a constant currency basis. **Advertising revenue was $1.211 billion, up 9% year-over-year, driven primarily by growth from DR advertising revenue, which increased 14% year-over-year.**

Brand oriented advertising revenue was down 3% year-over-year due to a combination of softness in upper funnel demand across all regions, as well as the ongoing shift in the mix of our advertising business toward performance oriented advertising solutions. This mix shift is evident in the fact that direct response advertising revenue contributed 75% of our total advertising revenue for the first time in Q1.

*          *          *

**North America revenue growth accelerated to 12% year-over-year in Q1, up from 8% in the prior quarter, with a faster growth rate in Q1, driven primarily by a higher rate of direct response advertising revenue growth.** Europe revenue grew 14% year-over-year, and Rest of World revenue grew 20% year-over-year, with softer brand oriented advertising demand in these regions, partially offsetting continued strong growth in direct response advertising revenue and continued momentum in the SMB customer segment, in particular in these regions.

(Emphasis added).

31.    Defendant Andersen then went on to provide a broad overview of the Company's expectations for the coming quarter, stating, in part:

We believe the combination of these transactions and our improved free cash flow generation ensures that our business has more than adequate capital and financial flexibility to execute against our strategic priorities. Given the uncertainty with respect to how macroeconomic conditions may evolve in the months ahead, and how this may impact advertising demand more broadly, we do not intend to share formal financial guidance for Q2.

**While our top line revenue has continued to grow, we have**

**experienced headwinds to start the current quarter, and we believe it is prudent to continue to balance our level of investment with realized revenue growth.** As a result, we are updating our full year cost structure guidance to reflect our current investment plans.

\*       \*       \*

**While there is uncertainty regarding the macro operating environment, we remain optimistic about the long-term prospects for our business.**

We remain optimistic because of the progress we have made with our ad platform to improve performance for our advertising partners because of the progress we have made to diversify our advertiser base as well as our revenue sources, with the growth of Snapchat+. **Because of our demonstrated ability to prioritize our cost structure to balance investment with top line growth over time, and because we have built a strong balance sheet with the financial flexibility necessary to maintain strategic focus through volatile macro conditions.**

Moving forward, we will remain focused on executing against our strategic priorities of growing our community and improving depth of engagement, driving top line revenue growth, and diversifying our revenue sources and building toward our long-term vision for augmented reality.

(Emphasis added).

32.    During the Q&A portion of the call, Defendants discussed their expectations for Snap's advertising platform and Snap's progress in the current second quarter of 2025:

**Q by analyst**: Great. I got to ask the obligatory macro question. So I think everybody is curious what you guys are seeing thus far here in the second quarter on both brand and DR. It sounds like you're growing, but you're starting to see some impact. So I guess, could you just give us a little bit more color on what categories or what segments of the business are seeing an impact?

**A by Defendant Andersen**: Thanks for the questions. It's Derek speaking. Yeah. At a high level, the macro is changing quickly, and I think the path we're concerned here going forward isn't entirely clear that obviously impacts visibility on our end. We've learned from some of the big past macro events that we've experienced in external events to be thoughtful about how this can impact the operating environment and, therefore our approach to guidance generally.

We've had a really solid Q1, top line growth at the very high end of our guide range, and then both adjusted EBITDA and net income well

above those ranges. So we started the year really strong. **Thus far in Q2, we're still growing, but we've seen some headwinds to our top line growth so far.** As one example, we've heard from a subset of advertisers that their spending has been impacted by the changes to the de minimis exemption.

However, I caution you, it's just really difficult to parse the drivers between the various potential factors there. **We're just really focused on continuing to execute for our customers and to build on the momentum we saw in Q1, with active advertisers up 60%, DR advertising revenue reaching 70% of total ad revenue for the first time.**

\*     \*     \*

**Q by analyst**: Hi. Thanks for taking the question. I guess one of the big questions that everyone is trying to understand, you've been sort of in that mid-teens-ish, low to mid-teens-ish growth rate for direct response advertising. The comp was definitely harder this quarter than it's been in a long time.

But I think as you sort of look at the investments you've been making, the rollout of new products like our sponsored Snaps, what will it take to deliver 20% plus growth in the DR business? Like, do you have line of sight to like what needs to happen or how long it will take to sort of get that to be a 20% plus growth business?

And then just two housekeeping things, Derek. One of the de minimis that you just mentioned, anything that you could say in terms of how much China based advertisers is a percentage of your revenue?

And on the guidance comment on the forward-looking that April is continuing to grow, I've got a lot of questions, is advertising growing, or is it -- if you look excluding Snap Plus, is it still growing excluding Snap Plus as you look into April because everyone is trying to isolate what's happening in core ad business given everything that's happened with tariffs? Thank you.

**A by Defendant Spiegel**: Yeah. We're really excited about the progress we've been making in the direct response business over the past couple of years. We've really invested heavily there. I think just thinking big picture in terms of the contributors to accelerating to 20% from, I think about 14% we're at today. **Of course, we're going to continue the ongoing ad platform improvements we mentioned on the call, including larger and fresher models and better signal utilization.**

**I think in terms of the product roadmap and the product pieces, we've got a really good roadmap for our app goal based bidding objectives and for dynamic product ads as well, that will land throughout the year.** And then I think bringing direct response goal based bidding objectives to new placements like sponsored snaps will also be a contributing factor as well.

-9-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*     *     *

**A by Defendant Andersen**: It's Derek speaking on the second parts of your question there. On the China based advertisers, we don't really break it down at that level of detail. We've not previously disclosed that market as a breakout market in our Qs and case. So in some ways, that perhaps is helpful in and of itself. **And look, we're early in the quarter. We're only a few weeks in.**

**You were continuing to grow as a business, but we've seen some headwinds thus far. I think it's early. And of course, there's a lot of quarter ahead of us in the macro uncertainty and how that's going to evolve over time. So we're going to keep watching it and monitoring the growth of the business, and go from there. So hopefully, that gives you a little bit more color on the China based side of things.**

*     *     *

**Q by analyst**: Thank you. Appreciate the opportunity. Maybe first you could talk a little bit about the kind of progression through the first quarter on the ad side. And as you go into April, any particular categories that you're seeing or geographies that you're seeing changes in performance? Maybe we'll start there and one follow-up after that. Thank you.

**A by Defendant Andersen**: I think first, we're really pleased with what we saw in Q1. We continue to execute against our roadmap and priorities on the ad platform. Pleased to see the progress we were able to make on model freshness and model size, and signal incorporation, and the progress we're seeing in copy adoption.

You're seeing that translate into the outputs of the business, both not just the top line revenue that was at the very high end of our range, but also the progress on the DR growth rate and what we're seeing with the growth of active advertisers and the progress in the SMB channel specifically, which we're really pleased with.

So off to a good start, really focused on executing for our customers and delivering roads for them. **In terms of what we're seeing early here in the new quarter, we're just a few weeks in. It's very early in the going. As I said earlier, the business is continuing to grow, but we have seen some headwinds to start the quarter to the growth rate.**

As I mentioned earlier, one example of a factor that we've seen as a driver there is some advertisers that have been impacted by the changes to the de-minimis exemption. But as I also said earlier, it's really difficult, it's early in the going to parse the different drivers that can be impacting that.

**So we're going to continue to watch it really carefully, and of course, where we head from here on the macro, and some of the factors there is also uncertain. So the key is that we stay focused on executing for our customers, improving the ad platfor**m, and that we continue to be thoughtful about balancing our investment levels over time to make progress for the business financially. So hopefully, that gives you a little bit more color on your question. Thank you.

*        *        *

**Q by analyst**: Thank you for taking my question. You mentioned hitting 900 million MAUs and that you're approaching 1 billion yet North America DAUs contracted sequentially. I know you've been working on a number of initiatives to restimulate growth in North America. So curious to hear what is potentially not working and what gives you confidence that those trends can reflect positively again? Thank you.

**A by Defendant Spiegel**: Thanks so much for the question. We're really excited about hitting that milestone of 900 million monthly active users and really looking forward to crossing 1 billion at some point here in the future. That will be a really exciting moment for the company. In North America, in particular, we sort of trended around this 100 million, 99 million DAU sort of number. **I think we're not expecting further declines here in Q2 in North America.**

**And the things that sort of make us confident or that we're excited about are really the engagement around snapping that is so core to the service, people making and sending snaps with their friends. So we've seen some positive trends there.** We're continuing to build on those overall and then continuing to invest in the content business as well, some of the things we mentioned earlier around content freshness, around homegrown creators, and engagement around content overall, that's a real priority for us as well.

(Emphasis added).

33.    The foregoing statements were materially false and misleading, and failed to disclose materially adverse facts about the Company's business and operations. Specifically, the statements failed to disclose that: (i) Snap's advertising growth potential was overstated; (ii) Snap's advertising revenue growth rate had significantly declined in April 2025 to a 1% growth rate compared to a 9% growth rate in the first quarter of 2025 due, in part, to an execution error by Snap; (iii) Snap's advertising growth rate was vulnerable to ongoing headwinds in the industry, which were understated by Snap; and (iv) as a result, the Company's

public statements were materially false and misleading at all relevant times.

C.    **The Truth is Revealed**

34.    On August 5, 2025, after the market closed, Snap issued a press release announcing its financial results for the second quarter of 2025. Such financial results showed a decline in Snap's advertising revenue growth rate. On the corresponding earnings conference call, Defendant Andersen stated, in part:

> As our global community continues to grow, we have continued to scale our top line with total revenue reaching $1.345 billion in Q2 and up 9% year-over-year. **Our rate of top line growth was impacted by a number of factors in Q2, including an issue related** to our ad platform, the timing of Ramadan and the effects of the de minimis changes. Unfortunately, in our efforts to improve advertiser performance, we shipped a change that caused some campaigns to clear the auction at substantially reduced prices. We have since reverted this change and advertising revenue growth has improved as advertisers adjust their bid strategies to achieve their objectives.
>
> **Despite these headwinds, advertising revenue reached $1.174 billion in Q2, up 4% year-over-year**, driven primarily by growth from DR advertising revenue, which increased 5% year-over-year.

(Emphasis added).

35.    Defendant Andersen went on to discuss more fully the timing and details of the error to Snap's advertising auction during the Q&A part that followed:

> So I think digging in on the impact in the quarter on the revenue, there are really multiple factors that we looked at in the quarter. One of them certainly is the one you mentioned around the ad platform. We also had a factor around the timing of Ramadan, which was less of a benefit in Q2 than in the prior year. And as well, there was the impact of the de minimis changes in the quarter.
>
> So each of those were a factor. I think maybe one of the things that could help out little bit in terms of understanding the relative impact of things would be to talk about the topography of ad revenue growth specifically over the last number of months as some of these shifts have come into the business.
>
> So if you recall, we grew ad revenue at a rate of approximately 9% in Q1. **And what we saw in April is that ad revenue growth declined to approximately 1% before largely recovering as we move through May and what you saw in May is, number one, we've gone to the work of reverting the ad platform change,** but also the factor around Ramadan obviously being diminished during that period of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

time. So we saw the recoveries we went through May.

\*      \*      \*

So the big focus at this point is building demand we have seen post the rollback of the ad change as we moved through June and into July. **We've seen ad revenue specifically growing at a rate between 3% to 4% so give you a sense of how the topography sort of moved from 9% in Q1 to approximately 1% ad revenue in April than to a rate of recovering largely in May and then we're looking at 3% to 4% plus the roll back to that change.**

(Emphasis added).

36.     On this news, Snap's stock price fell $1.61 per share, or 17.1%, to close at $7.78 per share on August 6, 2025.

37.     The above statements made by Defendants are in direct contrast to statements they made during the April 29, 2025, earnings conference call. During that call, Defendants touted their continued growth and promised to stay "focused on continuing to execute for our customers," while deferring guidance on potential macroeconomic risk and alleged reduced visibility. Defendants made no mention of an ongoing advertising issue, nor did they suggest the significant degree to which Snap's advertising growth rate had declined in April.

38.     A number of analysts who had been following Snap published negative reports in the wake of Snap's revelation. For example, Rosenblatt, while keeping their neutral rating, highlighted Snap's disappointing advertising revenue growth, stating, in part:

Snap's 2Q25 had an odd mishap. The company said an update to its ad auction system caused Snap to mistakenly auction ad inventory in April at a substantial, unintended discount, stalling ad growth at 1%, before the issue was fixed and ad growth stepped back up to ~ 4% for 2Q25. But even at this recovered pace, which is seen persisting in this zip code into 3Q25, ad growth is well below the 9% rise of 1Q25, and the 10% we had been estimating for 2Q25.

39.     Likewise, J.P. Morgan, while keeping their below-market price target, highlighted that Snap's "Ad revenue decelerated to +4% Y/Y in 2Q (vs. +9% Y/Y

in 1Q), including +1% Y/Y in April driven by an ad platform issue that temporarily reduced auction prices." Further, J.P. Morgan noted that investor expectations "had increased in recent days following strong broader advertising industry results/outlooks" than had previously been anticipated.

40.    HSBC also kept their below-market price target while noting that Snap's "2Q25 sluggish ad revenues drive negative market reaction." HSBC highlighted Snap's overall growth slowdown, noting that, despite "that growth had returned to a c4% y-o-y pace in July" following the "faulty product update," it was still significantly behind market leaders, such as "Meta's guidance for c21% y-o-y growth in 3Q25."

D.    **Defendants' Misconduct Has and Continues to Harm the Company**

41.    As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the Securities Action, as well as costs to be incurred in remediating deficiencies in the Company's internal controls.

42.    Snap's reputation and goodwill have also been damaged by the Defendants' misconduct.

43.    The Defendants failed to oversee and manage the Company in accordance with their fiduciary duties and Company policies, making the compensation provided by the Company excessive. The Officer Defendants received millions of dollars in equity compensation based on stock prices that had been inflated because of the false and misleading statements made or caused by the Defendants. The Board has not clawed back any of this compensation.

E.    **The Board Breached its Fiduciary Duties**

44.    As officers and/or directors of Snap, the Defendants owed Snap fiduciary duties of good faith, loyalty, and candor, and were and are required to use

-14-

their utmost ability to control and manage Snap in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of Snap, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

45.    Defendants, because of their positions of control and authority as directors and/or officers of Snap, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly-traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding Snap's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

46.    To discharge their duties, the officers and directors of Snap were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and Snap were required to, among other things:

(a)    Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

(b)    Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    Refrain from unduly benefiting themselves and other Company

-15-

insiders at the expense of the Company;

(d)    Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)    Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f)    Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

(g)    Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

47.    The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

48.    The Board's Audit Committee is tasked with overseeing Snap's financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of Snap's internal controls over financial reporting and its disclosure controls and procedures. Specifically, according to the Audit

Committee's charter, the Audit Committee's duties include:

***Financial Review and Disclosure:***

**5. Annual Audit Results.** The Audit Committee will review with Snap management and the independent auditors the results of the annual audit, including:

> ● the independent auditors' assessment of the quality of Snap's accounting principles and practices;
> ● the independent auditors' views about qualitative aspects of Snap's significant accounting practices, the reasonableness of significant judgments, and estimates (including material changes in estimates and analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements);
> ● all known and likely misstatements identified during the audit (other than those the independent auditors believe to be trivial);
> ● the adequacy of the disclosures in the financial statements; and
> ● any other matters that the independent auditors must communicate to the Audit Committee under applicable accounting or auditing standards.

**6. Audited Financial Statement Review; Quarterly and Annual Reports.** The Audit Committee will review the annual audited financial statements and quarterly financial statements with Snap management and the independent auditors. The Audit Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in Snap's Annual Report on Form 10-K.

*        *        *

***Internal Control and Procedures:***

> ● **Risk Assessment and Management.** The Audit Committee will review and discuss with Snap management and the independent auditors Snap's policies on financial risk management and assessment. The Audit Committee will provide regular reports to the Board about material issues affecting the quality or integrity of Snap's financial statements, compliance with legal or regulatory requirements, the performance or independence of the independent auditors, the performance of Snap's internal audit function, and other matters as the Audit Committee deems appropriate.

> ● **Internal Auditors.** The Audit Committee will review the audit plan of Snap's internal auditor and discuss with that team the adequacy and effectiveness of Snap's scope, staffing, and general audit approach. The Audit Committee will review any significant reports prepared by Snap's internal auditors, as well as management's response. The head of Snap's internal auditors

-17-

will also report to and be evaluated by the Audit Committee.

● **Internal Control over Financial Reporting; Disclosure Controls.** The Audit Committee will confer with Snap management and the independent auditors concerning the scope, design, adequacy, and effectiveness of internal control over financial reporting and Snap's disclosure controls and procedures. The Audit Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies. Periodically, the Audit Committee will meet in separate sessions with the independent auditors, Snap's internal auditors, and Snap management to discuss any matters that any of these parties believe should be discussed privately with the Audit Committee.

49.    In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, the Director Defendants conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

50.    In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

51.    The Defendants' flagrant violations of their fiduciary duties and

unwillingness to heed the requirements of their Audit Committee Charter have inflicted, and will continue to inflict, significant harm on Snap.

## **DERIVATIVE ALLEGATIONS**

52.     Plaintiff brings this action derivatively in the right and for the benefit of Snap to redress injuries suffered by Snap as a direct result of the Director Defendants' breaches of fiduciary duty. Snap is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

53.     Plaintiff will adequately and fairly represent the interests of Snap in enforcing and prosecuting the Company's rights.

54.     Plaintiff was a stockholder of Snap at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a Snap stockholder.

## **DEMAND FUTILITY ALLEGATIONS**

55.     Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

56.     The Snap currently has 11 members: the Director Defendants Spiegel, Murphy, Lynton, Coffey, Coles, Jenkins, Lanzone, Miller, Spence, Thorpe, and Vargas.

57.     Plaintiff has not made any demand on Snap's current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

58.     The Director Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. In addition, the Director Defendants owed a duty to, in good faith and

with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.

59.    The Director Defendants' making or authorization of the false and misleading statements discussed above caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Snap. The failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence, constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. The Director Defendants could not fairly and fully prosecute this action or any other action concerning the misconduct described above.

A.    **Demand is Excused as to the Defendant Spiegel**

60.    Defendant Spiegel is the Company's CEO. Defendant Spiegel received compensation of $3,298,781 in 2024. Defendant Spiegel depends on Snap for his income. According to the Form 10-K filed with the SEC on February 5, 2025 (the "2025 10-K"), Defendant Spiegel is not "independent" according to listing standards.

61.    Defendant Spiegel owns 2.7% of Snap's Class A common stock, 26.0% of Snap's Class B common stock, and 53.4% of Snap's Class C common stock. Altogether, Defendant Spiegel holds 53.1% of the total voting power over Snap, making Defendant Spiegel a majority owner. As Defendant Murphy holds 46.4% of the total voting power over Snap, and Defendants Spiegel and Murphy are co-founders of Snap, their combined 99.5% voting power render Defendant Spiegel

unable to consider a demand.

62.    Defendant Spiegel served as a director of the Company during the Relevant Time Period. As a director, Defendant Spiegel had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Spiegel was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

63.    Defendant Spiegel failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Snap's controls, Defendant Spiegel failed to protect corporate assets.

64.    In addition, Defendant Spiegel is a named defendant in the Securities Action.

65.    Defendant Spiegel therefore faces a substantial likelihood of liability.

B.    **Demand is Excused as to Defendant Murphy**

66.    Defendant Murphy is the Company's Chief Technology Officer. Defendant Murphy received compensation of $1,035,164 in 2024. Defendant Murphy depends on Snap for his income. According to the 2025 10-K, Defendant Murphy is not "independent" according to listing standards.

67.    Defendant Murphy owns 4.7% of Snap's Class A common stock, 26.0% of Snap's Class B common stock, and 46.6% of Snap's Class C common stock. Altogether, Defendant Murphy holds 46.4% of the total voting power over Snap. As Defendant Spiegel holds 53.1% of the total voting power over Snap, and Defendants Spiegel and Murphy are co-founders of Snap, their combined 99.5% voting power render Defendant Murphy unable to consider a demand.

68.    Defendant Murphy served as a director of the Company during the

Relevant Time Period. As a director, Defendant Murphy had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Murphy was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

69.     Defendant Murphy failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Snap's controls, Defendant Murphy failed to protect corporate assets.

C.     **Demand is Excused as to Defendant Lynton**

70.     Defendant Lynton served as a director of the Company during the Relevant Time Period. As a director, Defendant Lynton had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Lynton was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

71.     Defendant Lynton failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Snap's controls, Defendant Lynton failed to protect corporate assets.

72.     According to the 2025 10-K, Defendant Lynton received $397,718 in total compensation in connection with his role as a Company director in 2024. Such compensation was composed of $170,000 in fees earned or paid in cash and $227,718 in stock awards. Accordingly, Defendant Lynton cannot reasonably and objectively consider a demand to sue the Board that controls his continued

compensation.

73.     Defendant Lynton served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for assisting the Board in fulfilling its responsibility for oversight of the quality and integrity of the accounting and reporting practices of the Company. The Audit Committee was thus responsible for reviewing and approving Snap's Forms 10-Q filed during the Relevant Time Period. Defendant Lynton was thus responsible for knowingly or recklessly allowing the improper statements related to the impact of (i) Snap's advertising growth potential being overstated; (ii) a significant decline in Snap's advertising revenue growth rate in April 2025 to a 1% growth rate compared to a 9% growth rate in the first quarter of 2025 due, in part, to an execution error by Snap; and (iii) Snap understating the ongoing headwinds in the industry which affected Snap's advertising growth rate.

74.     Defendant Lynton knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Lynton breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Lynton faces a substantial likelihood of liability for these breaches, making any demand on Defendant Lynton futile.

D.     **Demand is Excused as to Defendant Coffey**

75.     Defendant Coffey served as a director of the Company during the Relevant Time Period. As a director, Defendant Coffey had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Coffey was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

76.     Defendant Coffey failed to conduct oversight of the Company's

internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Snap's controls, Defendant Coffey failed to protect corporate assets.

77.     According to the 2025 10-K, Defendant Coffey received $302,718 in total compensation in connection with her role as a Company director in 2024. Such compensation was composed of $75,000 in fees earned or paid in cash and $227,718 in stock awards. Accordingly, Defendant Coffey cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

78.     Defendant Coffey served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for assisting the Board in fulfilling its responsibility for oversight of the quality and integrity of the accounting and reporting practices of the Company. The Audit Committee was thus responsible for reviewing and approving Snap's Forms 10-Q filed during the Relevant Time Period. Defendant Coffey was thus responsible for knowingly or recklessly allowing the improper statements related to the impact of (i) Snap's advertising growth potential being overstated; (ii) a significant decline in Snap's advertising revenue growth rate in April 2025 to a 1% growth rate compared to a 9% growth rate in the first quarter of 2025 due, in part, to an execution error by Snap; and (iii) Snap understating the ongoing headwinds in the industry which affected Snap's advertising growth rate.

79.     Defendant Coffey knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Coffey breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Coffey faces a substantial likelihood of liability for these breaches, making any demand on Defendant Coffey futile.

E.     **Demand is Excused as to Defendant Coles**

80.     Defendant Coles served as a director of the Company during the Relevant Time Period. As a director, Defendant Coles had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Coles was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

81.     Defendant Coles failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Snap's controls, Defendant Coles failed to protect corporate assets.

82.     According to the 2025 10-K, Defendant Coles received $312,718 in total compensation in connection with her role as a Company director in 2024. Such compensation was composed of $85,000 in fees earned or paid in cash and $227,718 in stock awards. Accordingly, Defendant Coles cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

F.     **Demand is Excused as to Defendant Jenkins**

83.     Defendant Jenkins served as a director of the Company during the Relevant Time Period. As a director, Defendant Jenkins had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Jenkins was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

84.     Defendant Jenkins failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators,

investors, and the public. By consciously disregarding the duty to monitor Snap's controls, Defendant Jenkins failed to protect corporate assets.

85.     According to the 2025 10-K, Defendant Jenkins received $327,718 in total compensation in connection with her role as a Company director in 2024. Such compensation was composed of $100,000 in fees earned or paid in cash and $227,718 in stock awards. Accordingly, Defendant Jenkins cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

86.     Defendant Jenkins served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for assisting the Board in fulfilling its responsibility for oversight of the quality and integrity of the accounting and reporting practices of the Company. The Audit Committee was thus responsible for reviewing and approving Snap's Forms 10-Q filed during the Relevant Time Period. Defendant Jenkins was thus responsible for knowingly or recklessly allowing the improper statements related to the impact of (i) Snap's advertising growth potential being overstated; (ii) a significant decline in Snap's advertising revenue growth rate in April 2025 to a 1% growth rate compared to a 9% growth rate in the first quarter of 2025 due, in part, to an execution error by Snap; and (iii) Snap understating the ongoing headwinds in the industry which affected Snap's advertising growth rate.

87.     Defendant Jenkins knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Jenkins breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Jenkins faces a substantial likelihood of liability for these breaches, making any demand on Defendant Jenkins futile.

G.      **Demand is Excused as to Defendant Lanzone**

88.     Defendant Lanzone served as a director of the Company during the Relevant Time Period. As a director, Defendant Lanzone had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Lanzone was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

89.     Defendant Lanzone failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Snap's controls, Defendant Lanzone failed to protect corporate assets.

90.     According to the 2025 10-K, Defendant Lanzone received $258,492 in total compensation in connection with his role as a Company director in 2024. Such compensation was composed of $22,622 in fees earned or paid in cash and $235,870 in stock awards. Accordingly, Defendant Lanzone cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

H.     **Demand is Excused as to Defendant Miller**

91.     Defendant Miller served as a director of the Company during the Relevant Time Period. As a director, Defendant Miller had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Miller was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

92.     Defendant Miller failed to conduct oversight of the Company's internal

controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Snap's controls, Defendant Miller failed to protect corporate assets.

93. According to the 2025 10-K, Defendant Miller received $325,300 in total compensation in connection with his role as a Company director in 2024. Such compensation was composed of $97,582 in fees earned or paid in cash and $227,718 in stock awards. Accordingly, Defendant Miller cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

94. Defendant Miller served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for assisting the Board in fulfilling its responsibility for oversight of the quality and integrity of the accounting and reporting practices of the Company. The Audit Committee was thus responsible for reviewing and approving Snap's Forms 10-Q filed during the Relevant Time Period. Defendant Miller was thus responsible for knowingly or recklessly allowing the improper statements related to the impact of (i) Snap's advertising growth potential being overstated; (ii) a significant decline in Snap's advertising revenue growth rate in April 2025 to a 1% growth rate compared to a 9% growth rate in the first quarter of 2025 due, in part, to an execution error by Snap; and (iii) Snap understating the ongoing headwinds in the industry which affected Snap's advertising growth rate.

95. Defendant Miller knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Miller breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Miller faces a substantial likelihood of liability for these breaches, making any demand on Defendant Miller futile.

I.    **Demand is Excused as to Defendant Spence**

96.    Defendant Spence served as a director of the Company during the Relevant Time Period. As a director, Defendant Spence had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Spence was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

97.    Defendant Spence failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Snap's controls, Defendant Spence failed to protect corporate assets.

98.    According to the 2025 10-K, Defendant Spence received $302,718 in total compensation in connection with his role as a Company director in 2024. Such compensation was composed of $75,000 in fees earned or paid in cash and $227,718 in stock awards. Accordingly, Defendant Spence cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

**J.    Demand is Excused as to Defendant Thorpe**

106.    Defendant Thorpe served as a director of the Company during the Relevant Time Period. As a director, Defendant Thorpe had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Thorpe was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

107.    Defendant Thorpe failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

investors, and the public. By consciously disregarding the duty to monitor Snap's controls, Defendant Thorpe failed to protect corporate assets.

108.   According to the 2025 10-K, Defendant Thorpe received $362,718 in total compensation in connection with his role as a Company director in 2024. Such compensation was composed of $135,000 in fees earned or paid in cash and $227,718 in stock awards. Accordingly, Defendant Thorpe cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

109.   Defendant Thorpe served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for assisting the Board in fulfilling its responsibility for oversight of the quality and integrity of the accounting and reporting practices of the Company. The Audit Committee was thus responsible for reviewing and approving Snap's Forms 10-Q filed during the Relevant Time Period. Defendant Thorpe was thus responsible for knowingly or recklessly allowing the improper statements related to the impact of (i) Snap's advertising growth potential being overstated; (ii) a significant decline in Snap's advertising revenue growth rate in April 2025 to a 1% growth rate compared to a 9% growth rate in the first quarter of 2025 due, in part, to an execution error by Snap; and (iii) Snap understating the ongoing headwinds in the industry which affected Snap's advertising growth rate.

110.   Defendant Thorpe knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Thorpe breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Thorpe faces a substantial likelihood of liability for these breaches, making any demand on Defendant Thorpe futile.

### K.    Demand is Excused as to Defendant Vargas

112.   Defendant Vargas served as a director of the Company during the

Relevant Time Period. As a director, Defendant Vargas had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Vargas was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

113.    Defendant Vargas failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Snap's controls, Defendant Vargas failed to protect corporate assets.

114.    According to the 2025 10-K, Defendant Vargas received $362,718 in total compensation in connection with his role as a Company director in 2024. Such compensation was composed of $135,000 in fees earned or paid in cash and $227,718 in stock awards. Accordingly, Defendant Vargas cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

115.    Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

## CLAIMS FOR RELIEF

## COUNT I

### Breach of Fiduciary Duty
### (Derivatively Against The Director Defendants)

116.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

117.    Each of the Director Defendants owed and owes Snap the highest

obligations of loyalty, good faith, due care, and oversight.

118.   Each of the Director Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

119.   The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

120.   In addition, the Director Defendants further breached their fiduciary duties owed to Snap by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose that (i) Snap's advertising growth potential was overstated; (ii) Snap's advertising revenue growth rate had significantly declined in April 2025 to a 1% growth rate compared to a 9% growth rate in the first quarter of 2025 due, in part, to an execution error by Snap; (iii) Snap's advertising growth rate was vulnerable to ongoing headwinds in the industry, which were understated by Snap; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times. The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

121.   The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth

herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

122.   As a direct and proximate result of the breaches of duty alleged herein, Snap has sustained and will sustain significant damages.

123.   As a result of the misconduct alleged herein, these Defendants are liable to the Company.

124.   Plaintiff, on behalf of Snap, has no adequate remedy at law.

**COUNT II**
**Breach of Fiduciary Duty**
**(Derivatively Against the Officer Defendants)**

125.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

126.   The Officer Defendants are executive officers of the Company. As executive officers, the Officer Defendants owed and owe Snap the highest obligations of loyalty, good faith, due care, oversight, and candor.

127.   The Officer Defendants breached their fiduciary duties owed to Snap by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, failing to disclose (i) Snap's advertising growth potential was overstated; (ii) Snap's advertising revenue growth rate had significantly declined in April 2025 to a 1% growth rate compared to a 9% growth rate in the first quarter of 2025 due, in part, to an execution error by Snap;

(iii) Snap's advertising growth rate was vulnerable to ongoing headwinds in the industry, which were understated by Snap; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times. The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

128.   As a direct and proximate result of the breaches of duty alleged herein, Snap has sustained and will sustain significant damages.

129.   As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

130.   Plaintiff, on behalf of Snap, has no adequate remedy at law.

## COUNT III
## Gross Mismanagement
### (Derivatively Against All Defendants)

131.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

132.   By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation

133.   As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages.

134.   As a direct and proximate result of the gross mismanagement and breaches of duty alleged herein, Snap has sustained and will sustain significant damages.

135.   As a result of the misconduct alleged herein, the Defendants are liable to the Company.

136.   Plaintiff, on behalf of Snap, has no adequate remedy at law.

## COUNT IV

### Waste of Corporate Assets
### (Derivatively Against All Defendants)

137.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

138.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Time Period. It resulted in continuous, connected, and ongoing harm to the Company.

139.   As a result of the misconduct described above, the Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation to certain of its executive officers; (ii) awarding self-interested stock awards to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

140.   As a direct and proximate result of the waste of corporate assets and breaches of duty alleged herein, Snap has sustained significant damages.

141.   As a result of the misconduct alleged herein, the Defendants are liable to the Company.

142.   Plaintiff, on behalf of Snap, has no adequate remedy at law.

## COUNT V

### Unjust Enrichment
### (Derivatively Against the Officer Defendants)

143.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

144.   By their wrongful acts, violations of law, and false or misleading

-35-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

statements or omissions of material fact that they caused to be made, the Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

145. The Defendants either benefitted financially from the improper conduct, or received bonuses, stock awards, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

146. Plaintiff, on behalf of Snap, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary duties.

## COUNT VI

### Violations of Section 10(b) and Rule 10b-5 of the Exchange Act
### (Derivatively Against All Defendants)

147. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

148. During the Relevant Time Period, the Defendants engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

149. The Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or

omitting to state material facts necessary in order to make the statements made about Snap not misleading.

150.   The Defendants, as directors and officers of the Company, acted with scienter during the Relevant Time Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Defendants were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

151.   By virtue of the foregoing, the Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT VII

### Violations of Section 20(a) of the Exchange Act
### (Derivatively Against All Defendants)

152.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

153.   The Defendants, as directors and officers of the Company, were, at the time of the wrongs alleged herein, controlling persons of Snap and each of the officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Defendants had the power and influence, and exercised the same, to cause Snap to engage in the illegal conduct and practices complained of herein.

154.   Plaintiff, on behalf of Snap, has no adequate remedy at law.

## COUNT VIII

### For Contribution Under Sections 10(b) and 21D of the Exchange Act

**(Derivatively Against Defendants Spiegel and Andersen)**

155.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

156.   The conduct of Defendants Spiegel and Andersen, as described herein, has exposed the Company to significant liability under various federal securities laws.

157.   Snap, along with Defendants Spiegel and Andersen, are named as defendants in the related securities class actions that allege and assert claims arising under the federal securities laws. Snap is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein.

158.   If the Company is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of Defendants Spiegel and Andersen as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. Snap is entitled to contribution and indemnification from Defendants Spiegel and Andersen in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

159.   As officers and directors, Defendants Spiegel and Andersen had the power or ability to, and did, control or influence, either directly or indirectly, Snap's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

160.   Defendants Spiegel and Andersen are liable under § 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

161.   Defendants Spiegel and Andersen, through their misconduct, have damaged the Company and are liable to the Company for contribution.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

162.   Plaintiff, on behalf of Snap, has no adequate remedy at law.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A.       Declaring that Plaintiff may maintain this derivative action on behalf of Snap and that Plaintiff is a proper and adequate representative of the Company;

B.       Against all of the Defendants and in favor of Snap for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C.       Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D.       Awarding Snap restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.       Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.       Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: September 12, 2025          By:   /s/ Francis J. "Casey" Flynn, Jr.

Francis J. "Casey" Flynn, Jr., #304712
**LAW OFFICE OF FRANCIS J. FLYNN, JR.**
6057 Metropolitan Plz
Los Angeles, CA 90036
Tele: 314-662-2836
Email: casey@lawofficeflynn.com

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ROWLEY LAW PLLC**
Shane T. Rowley, Esq.**
Danielle Rowland Lindahl, Esq.**
50 Main Street, Suite 1000
White Plains, New York 10606
Phone: (914) 400-1920
Email:    srowley@rowleylawpllc.com
          drl@rowleylawpllc.com

** To seek admission pro hac vice

**ATTORNEYS FOR PLAINTIFFS**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT